UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

|  |  |  |
|---|---|---|
| MITCHELL PLUNK, | : | CASE NO. 1:21-cv-1557 |
| Plaintiff, | : | OPINION & ORDER |
| | : | [Resolving Doc. 13] |
| v. | : | |
| CHESTER TOWNSHIP, | : | |
| Defendant. | : | |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

In this civil rights action, Plaintiff Mitchell Plunk, a firefighter and paramedic, sues his former employer, Defendant Chester Township. He alleges that Defendant fired him without giving him sufficient opportunity to contest the firing.

With this decision the Court considers Chester Township's argument that Ohio law required its paramedic service work under a medical director. And it considers Chester Township's argument that the responsible non-employee medical director refused to allow Paramedic Plunk's continued employment after Plunk conducted a court-directed blood draw.

While acting as a Township-employed paramedic, Plaintiff Plunk performed an evidentiary blood draw on a DUI suspect. Because Township paramedics did not usually do blood draws, the Township and its privately employed medical director fired Plunk. The medical director pulled Plunk's permission to practice as a paramedic. The Township then fired Plunk because he needed some medical director's permission to do his job.

Before ending Plaintiff's long-held employment, Defendant gave Plunk a hearing. The hearing did not let Plaintiff challenge the medical director's decision.

Case No. 21-cv-01557
GWIN, J.

Plaintiff now argues that this hearing did not afford due process.  Defendant

disagrees and moves for summary judgment.  Because Defendant Chester Township and

the medical director acted in concert to remove Plaintiff Plunk without giving Plunk an

opportunity to challenge their decision's basis, the Court **DENIES** Defendant's motion.

I.    Background

  a.  Mitchell Plunk

Plaintiff Mitchell Plunk worked as a Firefighter/Paramedic for Defendant Chester

Township for nearly a decade before the Township fired him in 2020.

In the mid-1980s, before pursuing emergency medical training, Plaintiff Plunk

trained as a volunteer firefighter.[1]  He volunteered for Russell Township from 1983 to 1988

before leaving to pursue an automotive-sales career.[2]

In 2002, Plunk returned to part-time firefighting.[3]  He obtained his firefighter and

emergency-medical-technician certifications from a local community college.[4]  Russell

Township hired him as a part-time paid firefighter in 2003.[5]

After the 2008 financial crisis, Plunk's automotive business was failing.[6]  He

switched to firefighting full time.[7]  He graduated from paramedic school in 2010 and

started working for his hometown, Chester Township.[8]  And he continued to work part

time for Russell Township.[9]

---

[1] Doc. 13-1 at 3–4 (PageID 87–88).
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *See id.* at 4–5 (PageID 88–89).
[9] *Id.* at 2 (PageID 86).

- 2 -

Case No. 21-cv-01557
GWIN, J.

Apart from a six-month injured period, Plunk consistently met his continuing-

education requirements for both townships.[10]  By the time Defendant Chester Township

fired him in 2020, Plunk had obtained seven professional licenses: "Firefighter/Paramedic,

Fire Safety Inspector, Fire Officer 1 and 2, Fire Operations, Drivers Instructor, Hazmat

Tech, and Fire Officer Investigation."[11]

### b.  Dr. Spaner

Ohio law requires EMS employees operate under a physician's authorization.[12]  In

response to this Ohio requirement, each emergency-medical-service employer appoints a

medical director physician.[13]  Although medical directors do not work directly for the

township emergency medical services, medical directors give broad supervision of

supervised EMS departments under their license.  Medical directors also need approve EMS

employees permitted to operate under their medical license.[14]

Defendant Chester Township appointed Dr. Donald Spaner as its medical director.[15]

University Hospitals' EMS Training & Disaster Preparedness Institute employs Dr. Spaner as

its president.[16]  The University Hospital Institute supplies medical direction without charge

to dozens of Ohio municipalities' EMS organizations.[17]  Spaner acts as the medical director

for many unrelated EMS organizations.  The Township does not employ Dr. Spaner or pay

him.[18]

---

[10] Doc. 13-1 at 20 (PageID 104).
[11] Doc. 13-3 at 3 (PageID 130).
[12] O.R.C. § 4765.42.
[13] *See id.*
[14] O.A.C. § 4765-10-06
[15] Doc. 13-24 at 2 (PageID 313)
[16] Doc. 13-15 at 2 (PageID 236).
[17] *Id.*
[18] *Id.* at 2–3 (PageID 236–37).

- 3 -

Case No. 21-cv-01557
GWIN, J.

Ohio law requires a medical director's approval and requires added paramedic training before paramedics perform evidentiary blood draws.[19]  Dr. Spaner has not allowed any paramedic working under his license to do evidentiary blood draws.[20]

Dr. Spaner evaluates the medical care that paramedics working under his license provide by reviewing their patient care reports, called "run sheets."

### c.  Chester Fire Department's Collective Bargaining Agreement

Defendant Chester Township agreed to a collective-bargaining agreement with the Fire Fighters Association.[21]  The collective-bargaining agreement prohibits the Township from firing the Association's members without just cause.[22]  The collective-bargaining agreement also requires the Township "to adhere to the concept of progressive discipline except where the actions are of such a serious nature as to warrant termination."[23]

### d.  Plaintiff Plunk's Termination

On August 8, 2020, police, and fire-department units, including Plaintiff Plunk's EMT team, arrived at a one-car crash.[24]  The driver refused medical treatment, so the EMT team left.[25]

After clearing the accident, Paramedic Plunk returned to the fire station. His team then completed two reports: a medical run sheet and a fire-incident report.  Fire and paramedic employees complete the fire-incident report for all responded calls.[26]

---

[19] O.R.C. 4765.39; O.A.C. 4765-6-06.
[20] *Id.* at 3 (PageID 237).
[21] Doc. 13-10.
[22] *Id.* at 11 (PageID 217).
[23] *Id.*
[24] Doc. 13-4 at 5 (PageID 141).
[25] *Id.*
[26] Doc. 13-4 at 1–5 (PageID 137–141).

- 4 -

Case No. 21-cv-01557
  GWIN, J.

Police suspected the driver was intoxicated, but she refused field sobriety tests.[27]  In

the late August 8 or early August 9 hours, investigating officers asked for and received a

court-approved search warrant authorizing a blood draw from the woman driver.[28]  The

investigating police officers called the Chester Township station house to seek assistance in

carrying out the Court search warrant.[29]

As the most senior officer on duty, Plaintiff Plunk responded, went to the police

station, and took the blood sample directed by the Court search warrant.[30]  Plunk claims

that he obtained the driver's verbal consent to the procedure.[31]

After completing the draw, Plunk returned to the station and completed a second

fire-incident report.[32]  He was unsure whether he should file a new medical run sheet or

whether he should amend the team's run sheet from earlier, so he emailed his supervisor

for guidance.[33]  Because the Township started the disciplinary process before Plunk could

file or amend his run sheet, no run sheet documented the blood draw.[34]  Dr. Spaner later

claimed that Plunk had not filed a run sheet to conceal the blood draw from his review.[35]

On August 10, Assistant Fire Chief Karen Moleterno, told Dr. Spaner that Plunk had

conducted the search warrant blood draw but that the draw had not received prior

approval.[36]  Dr. Spaner then emailed Plaintiff's supervisor, Chief John Wargelin, and asked

---

[27] Doc. 13-6 at 12 (PageID 155).
[28] Doc 13-9.
[29] Doc 13-1 at 11 (PageID 95).
[30] *Id.*
[31] *Id.* at 12 (PageID 96).
[32] *Id.* at 16 (PageID 100).
[33] *Id.*
[34] *Id.*
[35] Doc. 13-19 at 1 (PageID 269) ("[T]he evening of the blood draw … [Plunk] didn't fill out an EMS report, and instead put it under fire reports, knowing I don't see these …").
[36] Doc. 13-20 at 1 (PageID 270).

- 5 -

Case No. 21-cv-01557
GWIN, J.

him to "take [Plaintiff] off line immediately."[37]  After that email, Chief Wargelin told Plaintiff he believed Plaintiff Plunk would be suspended for a week for withdrawing blood without the arrestee's consent.[38]  The Township does not now claim that Plunk lacked consent.[39]

Plunk informed his Russell Township supervisor, Chief Frazier, that Defendant Chester Township would likely suspend him.[40]  Chief Frazier said he would contact Russell's medical director, Dr. Sauto, to determine whether Plunk should report for his shifts at Russell Township while Chester Township considered suspending him.[41]

Plunk then tried to relay his conversation with Frazier to Chief Wargelin.[42] Apparently the two miscommunicated, and Chief Wargelin thought Plunk had claimed that Dr. Sauto had approved the blood draw.[43]  Chief Wargelin relayed that claim to Dr. Spaner, who contacted Dr. Sauto.[44]  Because Dr. Sauto denied authorizing the blood draw, Dr. Spaner believed that Plunk had lied to make the blood draw appear authorized.[45]

At some point, Assistant Chief Moleterno provided Dr. Spaner with 34 pages of emails between Dr. Spaner and Plaintiff's EMT team.[46]  Some of Dr. Spaner's emails criticized Plaintiff's earlier medical care.[47]  Dr. Spaner later admitted he may have misinterpreted the 34 pages of emails as 34 separate reprimands.[48]

---

[37] *Id.* Chief Wargelin and Assistant Chief Moleterno were both Township employees.
[38] Doc. 13-1 at 16–17 (PageID 100–01).
[39] *See* Doc. 13; Doc. 15.
[40] Doc. 13-1 at 17 (PageID 101).
[41] *Id.*
[42] *Id.*
[43] *See id.*
[44] *See* Doc. 13-19 at 1 (PageID 269).
[45] *See id.*
[46] Doc. 13-15 at 20 (PageID 254); Doc. 13-7.
[47] *See, e.g.*, Doc. 13-7 at 9 (PageID 171).
[48] Doc. 13-15 at 25 (PageID 259)

Case No. 21-cv-01557
GWIN, J.

In the evening on August 10, Dr. Spaner and Chief Wargelin spoke on the phone.[49] During this conversation, Spaner apparently requested that Chester Township end Plaintiff's EMT work for performing the court-directed blood draw without prior approval from Spaner, lying about receiving Dr. Sauto's approval, and his disciplinary history.[50]

On August 11, Chief Wargelin called Plaintiff and asked him to resign.[51]  The next day, Plaintiff called Chief Wargelin and informed him that he would not resign. Chief Wargelin then told Plaintiff he was fired.[52]

On August 17, Chief Wargelin and Assistant Chief Moleterno conducted a pre-discipline hearing with Plaintiff Plunk and his Firefighters Association representative.[53]  At the pre-discipline hearing, Chief Wargelin and Assistant Chief Moleterno gave Spaner's unwillingness to authorize Plunk to work under Spaner's certificate as the reason for the firing.[54]

On August 19, Dr. Spaner sent a letter to Chief Wargelin explaining his reasons for rescinding Plaintiff's permission to work under Spaner.  The letter said that:

- Plunk had attempted to circumvent Dr. Spaner's authority by consulting a different medical director;[55]

- Dr. Spaner had previously reprimanded Plunk 34 times;[56]

- Plunk did not satisfy continuing-education requirements;[57]

---

[49] Doc. 13-20 at 1 (PageID 270); Doc. 13-15 at 19 (PageID 253).
[50] Doc. 13-20 at 1 (PageID 270).
[51] Doc. 13-1 at 17 (PageID 101).
[52] Id.
[53] Doc. 13-12 at 1 (PageID 228).
[54] See id.
[55] Doc. 13-1 at 16 (PageID 100); Doc. 13-19 at 1 (PageID 269).
[56] Doc. 13-19 at 1 (PageID 269); Doc. 13-15 at 20 (PageID 254).
[57] Doc. 13-19 at 1 (PageID 269).

- 7 -

Case No. 21-cv-01557
GWIN, J.

- Plunk had exceeded his practice's scope by performing an evidentiary blood draw;[58] and

- Plunk had failed to file or falsified reports.[59]

The pre-disciplinary hearing had not discussed any of these claims.[60]

A week after the pre-disciplinary hearing, Defendant Chester Township's Board of

Trustees formally terminated Plaintiff Plunk.[61]

### e.  Procedural History

Plaintiff filed this suit on August 10, 2021.  He sued Chester Township under

§ 1983 for violating his procedural due process rights.[62]

Defendant Chester Township now moves for summary judgment.[63]  The parties

dispute whether Plaintiff Plunk received adequate pre-termination process.[64]

## II.    Discussion

### A.   Summary Judgment Standard.

A court will grant a motion for summary judgment "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."[65]  There is a genuine dispute as to a material fact when the "evidence is

such that a reasonable jury could return a verdict for the nonmoving party."[66]

---

[58] *Id.*
[59] *Id.*
[60] *See* Doc. 13-12 at 1 (PageID 228).
[61] Doc. 13-13 at 1 (PageID 233).
[62] Plaintiff did not name Dr. Spaner as a defendant.
[63] Doc. 13.
[64] Although Plaintiff's complaint alleged that Defendant also violated O.R.C. § 505.38(A), he seems to have abandoned that argument. *Compare* Doc. 1 *with* Doc. 14 at 3 (PageID 470). The parties agree that this Court may consider Plaintiff's § 1983 claim. Doc. 15 at 1 (PageID 478). Further, Plaintiff does not argue that he was deprived post-termination process. *See* Doc. 14 at 4–9 (PageID 471–76).
[65] Fed. R. Civ. P. 56(a).
[66] *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

- 8 -

Case No. 21-cv-01557
GWIN, J.

The Court "view[s] the evidence in the light most favorable to the nonmoving party."[67]

But, the nonmoving party "must show sufficient evidence to create a genuine issue of

material fact"[68] as to each of the claim's required elements.[69]  Summary judgment may be

granted "[i]f the evidence is merely colorable … or is not significantly probative."[70]

Because a reasonable jury could return a verdict for Plaintiff, Defendant has not

demonstrated that it is entitled to judgment as a matter of law.

### B.  Procedural Due Process

The Fourteenth Amendment's Due Process Clause prohibits state and local

governments from depriving someone of property without due process.[71]

Courts decide whether state action complied with due process using a two-step test.

First, the Court examines whether a plaintiff held a protected property interest.[72]  Second,

the Court decides whether a state actor violated the property interest without sufficient

procedures.[73]

#### 1.  State Action

Because Defendant and Dr. Spaner acted in concert to remove Plaintiff, due

process's requirements apply to their collective decision.

---

[67] *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020) (citing *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018)).

[68]  *Klepper v. First Am. Bank*, 916 F.2d 337, 341–42 (6th Cir.1990) (citation omitted).

[69] *Id.* (noting that a scintilla of evidence is not enough to defeat a summary judgment motion).

[70] *Anderson*, 477 U.S. at 250–51.

[71] *See Hasanaj v. Detroit Pub. Sch. Cmty. Dist.,* 35 F.4th 437, 447 (6th Cir. 2022) (quoting U.S. CONST. amend. XIV, § 1 cl.3).

[72] *Morrison v. Warren*, 375 F.3d 468, 474 (6th Cir. 2004).

[73] *Id.*

Case No. 21-cv-01557
GWIN, J.

The Due Process Clause constrains only state action.[74] So, private conduct, "no matter how unfair," generally does not violate due process.[75]

Defendant Chester Township indisputably engaged in state action when it fired Plaintiff Plunk.

Dr. Spaner, however, was not a state employee or agent.[76]  Thus, if Defendant and Dr. Spaner made their decisions wholly independently, Dr. Spaner's private decision to deauthorize Plaintiff would not implicate procedural due process.[77]

But when private actors act in concert with state actors to violate constitutional rights, the private actors' conduct becomes state action.[78]  In *Siefert v. Hamilton County*, the Sixth Circuit explained that this happens when "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."[79]  Examining the nexus between state and private actors requires a "necessarily fact-bound inquiry."[80]

A sufficient nexus exists, for example, when state and private actors "worked in tandem[,] ... collaborat[ed] and communicat[ed] ... [, and] depended on one another" when denying someone's due process.[81]

---

[74] *See Siefert v. Hamilton Cnty.*, 951 F.3d 753, 759 (6th Cir. 2020).

[75] *Id.* (quoting *NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988)).

[76] In his deposition, Dr. Spaner explained that Defendant did not employ him and that the EMS Institute provides its medical-director service for free. Doc. 13-15 at 2–3 (PageID 236–37). Plaintiff provided no evidence that Defendant employed Dr. Spaner or that Dr. Spaner otherwise acted as a state agent.

[77] *See Siefert*, 951 F.3d at 759 ("The Fourteenth Amendment ... has little to say about what private parties must do.").

[78] *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).

[79] *Siefert*, 951 F.3d at 759–60 (6th Cir. 2020) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)).

[80] *Brentwood Acad.*, 531 U.S. at 298 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)).

[81] *Id.* at 760.

Case No. 21-cv-01557
    GWIN, J.

So, the Court must examine the relationship between Dr. Spaner's decision to

revoke Plaintiff's permission to practice and Defendant's decision to terminate Plaintiff.

The record here shows a collaborative decision between Dr. Spaner and Defendant

to terminate Plaintiff Plunk.  In the days following the blood draw, Defendant's employees

worked closely with Dr. Spaner to decide how they would respond.  In his deposition, Dr.

Spaner reiterated that he and the Township collectively decided what to do:

- "I know that we had talked about it and I specifically asked to review all of the events that we've had to deal with Mitch [Plunk] over the years and to see what we can do to try to fix this issue so that it doesn't happen again."[82]

- "I'm sure I had some kind of discussion [about Plunk's removal from the Fire Department] with [Assistant Chief] Karen [Moleterno] … or [Chief] John [Wargelin] … of, you know, we've had a lot of incidences [sic], what are we going to do here. I mean, are we going to keep working with him, what should we do, is he salvageable, how can we fix Mr. Plunk."[83]

Defendant's employees likewise told Plaintiff that they would coordinate with Dr.

Spaner to decide how to proceed.[84]

Additionally, nothing in the record shows that Defendant opposed Dr. Spaner's

requests or made alternative recommendations.  Dr. Spaner requested permanent removal

only *after* conferring with Township employees.  And, Township employees only

mentioned removal after speaking with Dr. Spaner.

Moreover, if Defendant opposed Dr. Spaner's decision, Plaintiff's inability to

practice as a paramedic did not require firing him.  His substantial experience and multiple

professional licenses qualified him for other department positions.[85]  Plaintiff worked for

---

[82] Doc. 13-15 at 6 (PageID 240).
[83] *Id.* at 14 (PageID 248).
[84] Doc. 13-1 at 15, 17 (PageID 99, 101).
[85] *See* Doc 13-1 at 14 (PageID 98).

Case No. 21-cv-01557
GWIN, J.

the Township nine years before being terminated. Yet the Township didn't explain why it refused to retain Plaintiff in a non-paramedic capacity.[86]

The Court cannot extricate Dr. Spaner's decision to revoke Plantiff's permission to practice from Defendant's decision to fire him. Even Defendant's own brief conflates Dr. Spaner's permission revocation reasons with Defendant's reasons for terminating him.[87] Certainly, then, "[f]rom [Plunk's] perspective, it would have been hard to know who" decided to permanently remove him.[88] Because the distinction between Dr. Spaner and the Township all but disappeared, their concerted decision to remove Plaintiff was state action.

### 2. Protected Property Interest

Defendant's and Dr. Spaner's joint decision-making process also entwined Plaintiff's interest in Dr. Spaner's permission to practice with his protected interest in continued employment. At least employment as a paramedic.

Plaintiff enjoyed a protected employment property interest. The CBA between Defendant and the Firefighters Association specified that Plaintiff could be fired only for cause.[89] A for-cause requirement entitles an employee to continued employment.[90] And Dr. Spaner's deauthorization decision inseparably entwines with the Township's firing

---

[86] *See* Doc. 13-15 at 18 (PageID 252) (explaining that revoking Plaintiff's permission to practice as a paramedic didn't prohibit him from "firefighting duties" or "driving duties"); Doc. 13-24 at 3 (PageID 314) ("If Dr. Spaner does not allow an EMT of any level to perform emergency medical services under his license, that employee is unable to perform services *as an EMT* consistent with Ohio law.").

[87] *See* Doc. 13 at 25–26 (PageID 25–26) (citing Plaintiff's evidentiary blood draw and failure to document it as the "just cause" for which he was terminated).

[88] *Seifert*, 951 F.3d at 761.

[89] *See* Doc. 13-10 at 11 (PageID 217).

[90] *See Hudson v. City of Highland Park*, 943 F.3d 792, 800–01 (6th Cir. 2019).

- 12 -

Case No. 21-cv-01557
GWIN, J.

decision.[91]  Their joint decision to permanently remove Plaintiff is therefore subject to due-process requirements.

A contrary holding would vitiate a pre-disciplinary hearing's purpose as an "initial check against mistaken decisions."[92]  If a state EMS employer and its private medical director premise their joint disciplinary decision on mistaken facts, due process requires that the employee have an opportunity to correct the mistake.[93]

### 3.  Termination Process

Because Defendant and Dr. Spaner acted in concert when removing him, Plaintiff should have received an explanation of their shared evidence against him and an opportunity to challenge their conclusions.

"[A]n employee who has a protected property interest in continued employment is entitled to a pre-termination hearing, but that pre-termination hearing need not be elaborate."[94]  The hearing requires only "oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story."[95]

---

[91] *Cf. Brentwood Academy*, 531 U.S. at 296 (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)).

[92] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985)

[93] A contrary holding would also allow Defendant and other similarly situated state employers to insulate their employment decisions from due-process review. A state EMS employer who wished to fire its employee could coordinate with its private medical director to revoke the employee's permission to practice under the director's license. The employer could then cite the director's revocation—which the employee could not challenge—as its sole reason for terminating the employee. This would allow an end run around any for-cause-termination and progressive-discipline requirements.

[94] *Id.* (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)).

[95] *Gilbert v. Homar*, 520 U.S. 924, 929 (1997).

- 13 -

Case No. 21-cv-01557
GWIN, J.

A pre-termination hearing "should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."[96]

Defendant failed to fully explain its grounds for removing Plaintiff.  Although Township employees and Dr. Spaner had identified several grounds for terminating Plunk, the Township told Plunk that he was terminated solely because Dr. Spaner revoked Plaintiff's permission to practice.  It appears that, given the chance, Plaintiff probably could have rebutted several of the firing justifications.

All told, Defendant Chester Township has not carried its burden to demonstrate that Plaintiff's pre-disciplinary hearing complied with procedural due process as a legal matter.

## III.     Conclusion

For the foregoing reasons, the Court **DENIES** Defendant Chester Township's motion for summary judgment.

IT IS SO ORDERED.

Dated: September 26, 2022                    s/     James S. Gwin
                                             JAMES S. GWIN
                                             UNITED STATES DISTRICT JUDGE

---

[96] *Loudermill*, 470 U.S. at 545–46.

- 14 -